Thomas P. O'Donnell, Jr. et al., Petitioners *v.* Robert E. Casey, State Treasurer and Caryl M. Kline, Secretary of Education, Respondents.

Argued June 5, 1979, before President Judge Bow-MAN and Judges CRUMLISH, JR., WILKINSON, JR., MEN-CER, ROGERS, CRAIG and MACPHAIL. Judges BLATT and DISALLE did not participate.

*Robert T. Panowicz,* with him *Anthony B. Pan-away,* for petitioners.

*Paul Schilling,* Deputy Attorney General, with him *Susan J. Forney,* Deputy Attorney General, *Norman J. Watkins,* Deputy Attorney General, and *Edward G. Biester, Jr.,* Attorney General, for respondents.

Opinion by President Judge Bowman, September 5, 1979:

Invoking our original jurisdiction (42 Pa. C.S. §761) the Wilkes-Barre Area School District (District) joined by parents and taxpayers residing in that District with children attending District schools, by petition for review in the nature of a complaint in equity seek to enjoin the State Treasurer and the Secretary of Education from disbursing funds to any school district within the Commonwealth under provisions of The Public School Code of 1949[1] (School Code) establishing a formula for computation of the state subsidy.

Petitioners premise their request for an injunction upon the alleged unconstitutionality of the 1977 amendments to the School Code which redefine that formula by introducing a market value/income aid ratio. This formula, set forth in sections 2501 and 2502 of the School Code, 24 P.S. §§25-2501, 25-2502, includes three major elements: student enrollment; district spending per student; and the district's relative wealth. The District asserts that the formula used by the Commonwealth to measure district wealth and determine the amount of the subsidy payable to a district through the Secretary of Education and State Treasurer bears no rational relationship to a district's ability to raise revenue to meet its needs, and that distribution of Commonwealth funds in accordance with this formula is arbitrary, unreasonable and capricious, thereby violating due process protections guaranteed under the Pennsylvania Constitution, Art. I, §1, and the Fourteenth Amendment of the United States Constitution.

---

[1] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §1-101 *et seq.*

Respondents have filed preliminary objections to the petition alleging: (1.) that the petition fails to state a cause of action; (2.) that petitioners have failed to join the remaining five hundred and four (504) school districts as indispensable parties; (3.) the District's lack of standing to raise a due process challenge; and (4.) the failure to conform to the class action requirements of Pa. R.C.P. Nos. 1701-16.

In passing upon respondents' demurrer we accept as true all well-pleaded factual averments in the petition for review. *Department of Environmental Resources v. The Hartford Accident and Indemnity Co.*, 40 Pa. Commonwealth Ct. 133, 396 A.2d 885 (1979). Though replete with legal conclusions and argument, the only "facts" pleaded are statistics for the years 1970-1976 which disclose, (1.) that of all local school taxes collected in the Commonwealth, district levies on income represented a maximum of nine and two-tenths (9.2%) per cent of the total revenue collected each year, and (2.) that Wilkes-Barre Area School District during the period 1972-73 and 1976-77 has been able to raise only seven (7.0%) per cent of the revenue necessary to carry out its duty to support, maintain and operate its schools from taxes on income and only ten (10.0%) per cent of the total needed from all taxable sources other than property taxes, including taxes on income. To better understand the significance the District places on these figures it is necessary to discuss briefly the operation of Pennsylvania's school subsidy formula.

In order to finance its system of educational services, the legislature has vested in each school district "all the necessary authority and power annually to levy and collect, in the manner herein provided, the necessary taxes required, in addition to the annual State appropriation. . . ." Section 507 of the School Code, 24 P.S. §5-507.

We have had occasion recently to examine in detail the manner by which student enrollment, cost and district wealth are computed into the annual State appropriation:

Districts receive a payment for each child enrolled in school. Secondary children are 'weighted' so that the weighted average daily membership (WADM) exceeds actual enrollment. The Commonwealth then undertakes to pay a percentage of the medial actual instruction expense per WADM in the year for which reimbursement is to be payable. This 'aid ratio' is computed by dividing the market value of the district's real estate by WADM and comparing it to the State average tax base per student. If the district and State tax base are equal, the district receives fifty (50%) per cent of student cost. If the district base is lower, support is higher; if the base is higher, support is lower.

To assure the availability of uniform valuation statewide the State Tax Equalization Board (STEB) was formed and given the task of determining the market value of taxable real property in each school district. These market values are then the standard by which district wealth is measured in the equalization formula.

By virtue of the Act of August 24, 1977, P.L. [199], No. 59, two significant additions have been made to the subsidy formula. A school district's personal income is valued per WADM and comprises forty (40%) per cent of the aid ratio. Second, a school district's tax effort is measured in determining the 'base earned for reimbursement.' The more that effort sinks below the median statewide effort the more the figure to which the aid ratio is applied de-

creases. Each school district is then paid by the Commonwealth on account of instruction of the district's pupils an amount determined by multiplying the market value/income aid ratio times the actual instruction expenses per WADM or by the base earned for reimbursement, whichever is less, and by the WADM for the district. (Footnote omitted.)

*Danson v. Casey*, 33 Pa. Commonwealth Ct. 614, 622-23, 382 A.2d 1238, 1242 (1978), *aff'd,* Pa. , 399 A.2d 360 (1979).

Petitioners interpret this system to mean that the Commonwealth will consider a school district to have capacity to raise forty (40.0%) per cent of its cost through personal income taxes and sixty (60.0%) per cent through real estate taxes. They argue that introducing the personal income variable at a forty' (40.0%) per cent level is unrealistic in view of the historic inability of school districts to raise forty (40.0%) per cent of their revenue through personal income taxes, an inability exacerbated, they claim, by statutory limitations within section 8(3) of The Local Tax Enabling Act,[2] 53 P.S. §6908(3), restricting taxes by political subdivisions on individual wages, salaries, commissions and other earned income to no more than one (1.0%) per cent thereof. They argue further that the formula inherently results in a system whereby the amount a district taxes has no effect on the income aid ratio and permits the "wealthy" districts, who have an ability to tax, to receive a bonus while a "poorer" school district will be "penalized". These elements combine, argue petitioners, to extricate the formula from any rational relation with its avowed purpose, equal educational opportunity.

---

[2] Act of December 31, 1965, P.L. 1257, *as amended*, 53 P.S. §6901 *et seq.*

Petitioners misconstrue the purpose and effect of the market value/income aid ratio. It is not meant to be an exact measure of each district's actual tax effort, but rather a measure of the impact personal income and real estate values have on the *ability* of a district to raise revenue. This ability is reflected not only by the total income enjoyed by residents of the district but also as to the local tax effort by the variety of such nonproperty taxes as income, per capita, occupation, occupational privilege, or personal property taxes, among others, within the permissible statutory limits. *See* sections 2 and 8 of The Local Tax Enabling Act, 53 P.S. §§6902, 6908; *see also* section 672 of the School Code, 24 P.S. §6-672.

A heavy burden befalls constitutional challenges to legislation, the rule being that an act of the General Assembly cannot be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution. *Longwood Villa Nursing and Convalescent Home Appeal,* 26 Pa. Commonwealth Ct. 620, 364 A.2d 976 (1976). As we understand the traditional application of the rational relationship standard of substantive due process by which legislation is judicially measured, it is that the law must have a real and substantial relation to the objects sought to be attained. *Gambone v. Commonwealth,* 375 Pa. 547, 101 A.2d 634 (1954); *Teachers' Tenure Act Cases,* 329 Pa. 213, 224, 197 A. 344, 352 (1938) ("[i]n considering laws relating to the public school system, courts will not inquire into the reason, wisdom or expediency of the legislative policy with regard to education, but whether the legislation has a reasonable relation to [a thorough and efficient system of public schools]").

The legislature has provided for payments on account of instruction for the express purpose of reducing school taxes and maintaining or restoring

school programs. Section 15 of the Act of August 24, 1977, P.L. 199, 24 P.S. §25-2502 (note). The aid formula utilized to compute those payments are "yet another step in continuing . . . attempts to correlate State aid . . . with local districts' needs and fiscal capacity. . . . The goal is to equalize educational opportunity and remove that opportunity from dependence upon the student's situs or status." *Danson v. Casey, supra* at 623-24, 382 A.2d 1242-43.

Petitioners are not challenging the legitimacy of the stated objective, or even the means devised to achieve that objective. Rather, they have raised a difference of opinion as to the weight to be ascribed the personal income variable of the aid ratio. Not only is this an attempt to enter a degree of mathematical exactitude never deemed a part of constitutional rational relation analysis, *cf. Dandridge v. Williams,* 397 U.S. 471 (1970) (decided on equal protection grounds), but is also a patent attempt to invoke judicial legislation, a role we are unwilling to play:

> [For] '[i]t is the province of the legislature, not the judiciary . . . to determine the means necessary to combat' public problems, for with means as with ends 'the legislature, which is more responsive to the people and has more adequate facilities for gathering and assembling the requisite data, is in a better position to evaluate and determine' alternative approaches. . . . Our inquiry is limited to a determination of whether the means selected are so 'demonstrably irrelevant to the policy the legislature is free to adopt' as to be arbitrary and irrational. (Citations omitted.)

*Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 9, 331 A.2d 198, 202 (1975): "Therefore all matters, whether they be contracts bearing upon education, or legislative determinations of school policy

or the scope of educational activity, everything directly related to the maintenance of a 'thorough and efficient system of public schools,' must all times be subjected to . . . legislative control." *Teachers' Tenure Act Cases, supra* at 225, 197 A. at 352.

Personal income as a measure of wealth and ability to pay has a subtle impact upon all tax revenues however raised. In introducing the personal income factor by way of a market value/income aid ratio into the subsidy formula the legislature gave recognition to this reality as an additional element in a complex formula containing many other factors. It did not do so, nor purport to do so, in a mathematical recognition of the local tax effort with respect to personal income taxes and real property taxes. Because we have held that "the state aid system weighing district density or sparsity, poverty, number of students, cost per student and district wealth measured by income and equalized real property assessments bears a facially fair and substantial relation to promoting equal educational opportunity," *Danson v. Casey, supra* at 632, 382 A.2d at 1246, we also hold that the system bears an equally rational relationship to promoting that objective.

Being of the opinion that the instant petition for review fails to state a cause of action, with respect to the only substantive issue it raises, we do not pass upon the remaining procedural issues presented by respondents' preliminary objections.

ORDER

Now, September 5, 1979, the demurrer of respondents is sustained and the petition for review is dismissed for failure to state a cause of action.